**NOT RECOMMENDED FOR PUBLICATION**
File Name: 09a0822n.06

No. 08-4448

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **John Warren and James Warren,** | ) | |
| | ) | |
| **Plaintiffs-Appellants,** | ) | **FILED** |
| | ) | **Dec 22, 2009** |
| **v.** | ) | LEONARD GREEN, Clerk |
| | ) | |
| **Federal Insurance Co.,** | ) | |
| | ) | |
| **Defendant-Appellee.** | ) | **ON APPEAL** FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**BEFORE:** Merritt, Clay, and McKeague, Circuit Judges.

**MERRITT, Circuit Judge.** This is an appeal from a grant of summary judgment to defendant Federal Insurance Company concerning a dispute over insurance coverage. Plaintiffs John and James Warren filed suit against Federal Insurance after the company denied coverage to the Warrens under the directors and officers liability section of a policy issued to the Warrens' former company, Prime Measurement Products, LLC. The primary issue on appeal is whether language in a letter sent to plaintiffs by PNC Bank advising that the bank was "evaluating" its rights and remedies with respect to possible financial misrepresentations by plaintiffs triggered a duty to defend and indemnify by Federal Insurance under Ohio law. The district court found that the letter sent to plaintiffs did not present a claim under the plain language of the policy and did not obligate

the insurance company to defend or indemnify plaintiffs. We agree with the district court and base our opinion on the reasoning of the lower court.

## I. Facts

Plaintiffs John (a/k/a "Jeff") and his brother James (a/k/a "Jamie") Warren, through a limited liability company, The Warren Group, LTD, owned a 50% interest in BIS Holdings, LLC. The George Hofmeister Family Trusts owned the remaining 50%. BIS Holdings is a holding company that held all the interest in Prime Measurement Products, LLC. Prime Measurement was a manufacturer of measurement tools and control sensors for the oil, gas and process markets. The Warrens were officers and directors of both BIS Holdings and Prime Measurement from mid-2001 until May 2005. On February 24, 2004, Prime Measurement obtained a revolving line of credit from PNC Bank that permitted Prime Measurement to borrow money for working capital purposes based on a formula that included, but was not limited to, the book value of Prime Measurement's inventory. Both John and James Warren signed a personal guaranty on the line of credit. The personal guaranty contained a "cognovit" provision, which allows the bank to enter a judicial confession of judgment.

In addition, BIS Holdings purchased a comprehensive general liability insurance policy from defendant, Federal Insurance,[1] which included directors and officers liability coverage. The policy covered BIS Holdings and its subsidiaries, including Prime Measurement, and the policy was in effect from July 1, 2005 to August 1, 2006.

---

[1]The "Chubb Group" is a trade name used by Federal Insurance, but it is not a separate legal entity.

In May 2005, plaintiffs, through their company The Warren Group, LTD., sold their ownership in BIS Holdings (including Prime Measurement, which was a subsidiary of BIS Holdings), leaving control of the company in the hands of The Hofmeister Family Trusts. For approximately six months after the sale of BIS Holdings (and its subsidiary Prime Measurement), both plaintiffs performed various services for BIS Holdings and Prime Measurement, including John Warren's service as interim CEO of Prime Measurement until July 2005 (two months after the sale of Prime Measurement). In mid-to-late 2005, after plaintiffs had sold their interest in and were no longer actively managing Prime Measurement, the company's financial condition started to deteriorate, causing PNC Bank to advise plaintiffs that certain events of default occurred relating to the revolving line of credit. PNC Bank demanded that plaintiffs fulfill their obligations under the personal guaranty. Plaintiffs refused and PNC Bank filed a complaint in Ohio state court based on the personal guaranty signed by both plaintiffs. *PNC Bank N.A. v. Jeff J. Warren and James K. Warren*, No. 06-CV-144885 (Lorain Cty. Com. Pleas Ct. Jan 20, 2006). There were no allegations in the complaint relating to any misrepresentations or other improper or negligent actions on the part of plaintiffs. Based on the cognovit provision in the guaranty, judgment was automatically entered against plaintiffs in the amount of $700,000. The Warrens immediately filed for a stay of execution on the judgment and a motion to vacate the judgment, citing numerous defenses.

On March 22, 2006, plaintiffs' attorney, Thomas Muzilla, received a letter from a PNC Bank regarding various issues, mostly relating to the guaranty. The letter, however, included the following paragraph:

> In addition to your clients' liability to PNC as set forth above (under the guaranty and with respect to the purchase of their interest in BIS Holdings) *we believe that the Warrens were responsible for misrepresentations* regarding Prime's inventory which affected (a) the borrowing base certificates provided to PNC, and (b) Prime's financial statements upon which PNC relied. *We are currently evaluating PNC's rights and remedies* with respect to these misrepresentations.

(Emphasis added.) On or about April 20, 2006, Prime Measurement, through its local insurance broker Hylant of Indiana, LLC, notified Federal Insurance of a claim being made against the Warrens via an electronic claim system. In the section titled "Loss Description," Buffy Thomas of Hylant insurance company wrote:

> Specialty – D&O Other – PNC Bank has delivered written notice to former officers, Jeff & Jamie Warren, were [sic] responsible for misrepresentation regarding Prime's inventory which affected the borrowing base certificates of Prime provided to PNC and Prime's financial statements, each of which PNC relied upon in making loans to Prime. The Warrens deny the allegations of PNC.

Directors & Officers Loss Notice. On April 28, 2006, plaintiffs' lawyer received an email from PNC Bank rejecting a settlement offer from the Warrens to settle all claims against them. In that email, PNC Bank wrote:

> The proposal is rejected. The Warrens have substantial liability to PNC ($700,000 plus claims I've outlined in prior correspondence with you) and cannot buy out for $100,000. PNC intends to press all of its claims against the Warrens. . . .

Email dated April 28, 2006, from Leo Plotkin of PNC Bank to Thomas Muzilla. On May 3, 2006, Federal Insurance sent a letter to Prime Measurement's insurance broker, Hylant, acknowledging receipt of the electronic claim and requesting "any additional pertinent information or documentation regarding the facts and circumstances of this matter." Letter dated May 3, 2006, from Sandra Abair of Chubb Group to Buffy Thomas of Hylant of Indiana. On May 17, 2006, Federal Insurance sent

an email to plaintiffs' counsel requesting certain documentation concerning the litigation on the guaranty and specifically requesting "[c]opies of any and all correspondence regarding the matters referenced in [PNC Bank's] March 22, 2006, letter." Email dated May 17, 2006, from Federal Insurance to Thomas Muzilla. On May 19, plaintiffs' counsel provided to Federal Insurance the documents concerning the litigation on the guaranty, but did not enclose the April 28 email from PNC Bank regarding rejection of the settlement offer. There is nothing in the record to indicate that any further correspondence or communication transpired between Federal Insurance and plaintiffs, plaintiffs' attorney or plaintiffs' insurance brokers at Hylant until August 8, 2006, when Federal Insurance notified plaintiffs of the denial of coverage. Federal Insurance denied coverage because the policy did not cover the cognovit guaranty filed by PNC Bank against plaintiffs.

On June 27, 2007, after a lengthy court-ordered mediation process, plaintiffs and PNC Bank settled all claims between them for $350,000. The Settlement Agreement expressly provides that PNC Bank "alleges that [plaintiffs] committed certain malfeasance while officers and/or agents of Prime . . . ." and indicates that $300,000 of the $350,000 payment was allocated to "claims asserted by PNC . . . for accounting irregularities . . . ." and $50,000 as settlement on the guaranty. Settlement Agreement between PNC Bank and John Warren and James Warren, dated June 27, 2007.

Several months after the settlement was completed, plaintiffs filed suit in Ohio state court against Federal Insurance for breach of contract (Count I), bad faith (Count II) and Declaratory Judgment on enforceability of the policy (Count III). Federal Insurance removed to federal court based on diversity jurisdiction, 28 U.S.C. § 1332, where it argued that plaintiffs are simply

attempting to escape a liability by converting a personal debt based on their suretyship contract into

an insurance indemnification claim, as the district court also recognized when it noted:

> The Court is somewhat disturbed that plaintiffs are seeking insurance coverage for the *vast majority* of the amount paid to PNC pursuant to the settlement agreement. It is surprising, to say the least, that so little of the amount was designated as payment under the guaranty, even though that claim is undoubtedly easier to litigate. This is especially so given that PNC did not even assert a claim for accounting malfeasance.

Dist. Ct. slip op. at 12 n.5 (emphasis in original).

The district court bifurcated plaintiffs' bad faith claim (Count II) from the other two claims

and stayed all discovery relating to the bad faith claim. The breach of contract and declaratory

judgment claims were decided on summary judgment in favor of defendant. *Warren v. Fed. Ins. Co.*,

No. 1:07 CV 3695 (N.D. Ohio Aug. 21, 2008). Plaintiffs appeal (1) the grant of summary judgment

in favor of Federal Insurance on the breach of contract and declaratory judgment claims, (2) the

bifurcation of the proceeding below, which precluded discovery on the bad faith count unless

coverage was established and (3) the decision of the district court to prohibit depositions of Federal

Insurance employees who made the decision to deny coverage.

## II. Discussion

### A. Breach of Contract/Declaratory Judgment Count

Plaintiffs claim that Federal Insurance breached its contract by not defending and

indemnifying plaintiffs in their dispute with PNC Bank. The relevant language in the policy

provides as follows:

> The Company shall pay Loss on behalf of Insured Persons resulting from any D&O [directors and officers] Claim first made against such insureds during the Policy period, or any applicable Extended Reporting Period, for Wrongful Acts, but only to

the extent the Insured Organization does not indemnify the Insured Person for such Loss.

A "D&O Claim" is defined, in relevant part, as follows:

(a) *written demand for monetary damages* or non-monetary relief;
(b) a civil proceeding commenced by the service of a complaint or similar pleading;

***

against an insured for a Wrongful Act, including any appeal therefrom.

Section I(D)(1)(a), (b) (emphasis added).

Plaintiffs argue that the March 22nd letter from PNC Bank to plaintiffs constitutes a " written demand for monetary damages" under subpart (a) of the definition for a "D&O Claim." Federal Insurance argues that the letter states only that PNC Bank is "evaluating" its options and makes no "demand for monetary damages." The relevant portion of the March 22nd letter provides as follows:

[W]e believe that the Warrens were responsible for misrepresentations regarding Prime's inventory which affected (a) the borrowing base certificates provided to PNC, and (b) Prime's financial statements upon which PNC relied. We are currently evaluating PNC's rights and remedies with respect to these misrepresentations.

The district court agreed with Federal Insurance, finding that the March 22nd letter is not a D&O Claim as that term is defined in the policy. The lower court explained that PNC Bank could not be "currently evaluating" its rights and remedies and "making a claim for monetary damages" because the two concepts are "mutually exclusive." D. Ct. slip op. at 7. The district court also found that the plain language of the March 22nd letter does not contain a demand for monetary damages as required for coverage under the policy. *Id.* We agree.

Plaintiffs also point to cases where they contend that Federal Insurance covered a policyholder in the same or very similar circumstances to this case and argue that Federal Insurance

is estopped from denying coverage in this case.  We agree with the district court's conclusion that the cases cited by plaintiffs are different from the situation herein because the language relied upon by plaintiffs in the other cases is decidedly different from the language in the March 22nd letter. None of the cases where coverage was provided cite to language that indicates a party was still "evaluating its rights and remedies."

In the court below, plaintiffs also argued that the underlying suit by PNC Bank on the guaranty involved allegations of financial malfeasance that were "intertwined" with the claim based on the cognovit guaranty, thereby constituting a claim under subpart (b) of the policy as well, but it appears that they have abandoned that theory on appeal.[2]  Plaintiffs also contend that the district court erred in refusing to consider other evidence offered by them *after* the claim was denied by Federal Insurance because such evidence demonstrates that PNC Bank did in fact make a "written demand for monetary damages" against plaintiffs during the spring of 2006.

The other evidence on which the Warrens rely,  (1) the affidavit of Wallace Clements, Senior Vice-President of PNC Bank, (2) the April 4, 2007, letter from PNC Banks' attorneys regarding settlement and (3) the settlement agreement between the Warrens and PNC Bank, which was executed in June 2007, were not in existence during the spring and summer of 2006 when Federal

---

[2]In their Reply Brief, plaintiffs state:  "Federal argues that Section II(D)(1)(b) of the Policy does not apply. . . .  However, the Warrens have not [ever] asserted that this provision provides them with coverage."  Reply Brief at 15 n.4.  Despite this claim, plaintiffs did in fact argue below that the alleged misrepresentations constitute a Directors & Officers Claim under subpart (b). Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment at 15  (Heading entitled "The Wrongful Act Constitutes a 'D&O Claim' Under Section II(D)(1)(b)") .  The district court addressed plaintiffs' argument that it was entitled to coverage under subpart (b) at pages 10-11 of its opinion below.

Insurance was reviewing the claim. These documents only came into existence *because* Federal Insurance denied the claim. For example, plaintiffs argue that an affidavit by a PNC Bank officer did not constitute an inadmissible legal conclusion and should have been considered by the district court even though the affidavit stated that the March 22 letter from PNC Bank to plaintiffs served as a "written demand for damages" under the policy. Plaintiffs also point to an April 7, 2007, letter wherein PNC Bank estimated its loss due to plaintiffs' malfeasance at $3.5 million and plaintiffs claim that Michelle Lafferty, an employee of Hylant (the Warrens' local insurance broker), sent an email to Michael Joyce, the Federal Insurance employee who signed the denial letter, wherein Ms. Lafferty says that she and Mr. Joyce discussed "their impression" that Mr. Joyce only reviewed the PNC Bank complaint on the cognovit guaranty when preparing the denial letter and did not review the March 22 letter. Such extrinsic and after-the-fact "evidence," none of which Federal Insurance received before denying the claim, does not serve to turn the March 22 letter into a "written demand for monetary damages" or serve as adequate notice to Federal Insurance that a claim had been made against the plaintiffs that would be covered under the policy.

**B. Plaintiffs Did Not Give Notice to Federal Insurance of a "Potential Claim"**

Plaintiffs argue that Federal Insurance should have known from the correspondence it received that a potential claim had been made against them by PNC Bank, even if it did not meet the definition of a "D&O Claim." The policy addresses coverage for potential claims that arise during the policy period but do not come to fruition until after coverage has ended. To the extent that later documentation, for example the April 28, 2006, email sent to the plaintiffs by PNC Bank, or other correspondence or circumstances, presented evidence that PNC Bank's "evaluation" of its rights and

remedies had ripened into an actual claim, it does not appear that Federal Insurance received actual

notice of a "D&O Claim" as required under the policy. By simply informing Federal Insurance that

an investigation into plaintiffs' conduct was underway and might lead to more claims against them,

plaintiffs did not comply with the policy terms.[3]  Under (A)(1), plaintiffs were obligated to provide

---

[3]The policy provides, in pertinent part, as follows:

VII.  REPORTING

(A)      Solely with respect to any Liability Coverage Section:

(1)  Any Insured shall, as a condition precedent to exercising their rights under any Liability Coverage Section, give to the Company written notice as soon as practicable of any Claim.

(2)  If during the Policy Period . . . an Insured becomes aware of a Potential Employment claim or Potential Third Party Claim which could give rise to any Employment Claim or Third Party Claim . . . or becomes aware of circumstances which could give rise to any Claim, other than an Employment Claim or Third Party Claim . . ., and gives written notice of such Potential Employment Claim, Potential Third Party Claim or circumstances to the Company as soon as practicable thereafter but before the expiration or cancellation of this Policy, then any Claim subsequently arising from such Potential Employment Claim, Potential Third Party Claim or circumstances shall be considered to have been made against the Insured during the Policy Year in which [such claims] or circumstances were first reported to the Company.

***

VIII.  NOTICE

(A)  Any notice to the Company . . . shall designate the Coverage Section under which the notice is being given and shall be treated as notice under only the Coverage Section(s) so designated.

notice of the *actual* claim when it arose.

The policy provisions on notice and reporting ensure that Federal Insurance has the necessary information to evaluate whether coverage is warranted when a policyholder makes a claim. Plaintiffs concede it was "a very fluid situation" between them and PNC Bank during the time in question (Plaintiffs' opening brief at 25), but yet they did not keep Federal Insurance apprised of all of the circumstances and correspondence regarding the situation despite Federal Insurance's request in its May 17 letter that they provide all relevant correspondence regarding the litigation with PNC Bank. The changing nature of the situation did not absolve plaintiffs from giving Federal Insurance actual notice of the claim and ensuring that the company had all the details of the "very fluid" situation.

Plaintiffs also contend that the district court erred in its refusal to consider the April 28 email sent to plaintiffs by PNC Bank, even though plaintiffs essentially concede, as the district court found, that there is no evidence that the email was ever sent to Federal Insurance by plaintiffs. The email provides, in relevant part,

> The proposal [for settlement] is rejected. The Warrens have substantial liability to PNC ($700,000 plus claims I've outlined in prior correspondence with you) and cannot buy out for $100,000. PNC intends to press all of its claims against the Warrens . . . .

Plaintiffs contend on appeal that the failure to consider the email improperly "shifts the burden" of proof to plaintiffs because Federal Insurance failed to notify them before denying their claim that additional information was required. However, on May 17, Federal Insurance sent an email to plaintiffs' attorney requesting "[c]opies of any and all correspondence *regarding the matters referenced in [PNC Bank's] March 22, 2006, letter*." (Emphasis added.) Two days later, plaintiffs'

attorney sent Federal Insurance a letter and enclosed various documents regarding the litigation between PNC Bank and plaintiffs, but failed to mention or provide a copy of the April 28 email. It was plaintiffs who failed to give Federal Insurance all the necessary documentation, as specifically requested by Federal Insurance on May 17, almost three months before it issued the denial letter. Under the terms of the policy and pursuant to the specific request by Federal Insurance in May, it was incumbent upon plaintiffs to ensure that Federal Insurance had actual notice of a claim before the denial letter was issued in August.

It is in the interests of both the plaintiffs and PNC Bank to set up Federal Insurance as a source of payment for the suretyship obligation, and the settlement agreement between PNC Bank and plaintiffs reflects that joint interest. But in situations of this kind, we must be conscious of these interests and require strict compliance with the insurance contract before shifting payment to the insurance company for what appears to be a personal debt that the insurer has not agreed to reimburse.

**C. Bad Faith**

Plaintiffs contend that the district court erred in bifurcating the bad faith count of their complaint from the coverage issues. We review the district court's decision to bifurcate the bad-faith claim and stay discovery while the breach of contract claim is pending for abuse of discretion. *Smith v. Allstate Ins. Co.,* 403 F.3d 401 (6th Cir. 2005); *Gettings v. Building Laborers Local 310 Fringe Benefits Fund,* 349 F.3d 300, 304-05 (6th Cir. 2003) (reviewing a stay of discovery for abuse of discretion). Because the merits of the bad faith claim depended on

whether coverage was properly or improperly denied, it was reasonable for the district court to

resolve the coverage question before allowing the bad faith claim to proceed.

For the foregoing reasons, the judgment of the district court is affirmed.